[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11756
_____

D.C. Docket No. 1:16-cv-02538-ODE

BRAD KNOX,

Plaintiff - Appellant,

versus

ROPER PUMP COMPANY,
HANSEN TECHNOLOGIES CORPORATION,
ROPER TECHNOLOGIES, INC.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(April 30, 2020)

Before MARCUS, JULIE CARNES and KELLY,[*] Circuit Judges.

MARCUS, Circuit Judge:

In September 2015, Brad Knox, an African-American man and quality test technician at Roper Pump Company for fifteen years, got into a fight with his adult daughter, Kayla Knox ("Kayla"), at their shared home.  Whether father or daughter initially escalated the domestic altercation to physical violence was disputed, but it was undisputed that Knox struck Kayla during the fight.  Kayla worked in the same facility as Knox, but for one of Roper's affiliated companies, Hansen Technologies Corporation.  She went to work the next day and complained to Roper's human resources department.  Because violence against a coworker violated Roper's workplace violence policy, Roper suspended Knox.  Shortly after his suspension, Knox called an employee ethics hotline to complain that he believed he was being discriminated against on account of race because white employees who had violated the workplace violence policy had been allowed to continue working.

Roper told Knox he could keep his job if he completed anger management classes while on unpaid leave.  But when Roper sent Knox the written agreement, it included a release of all claims against Roper -- including, expressly, Title VII

---

[*] Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, sitting by designation.

claims.  Knox refused to sign the agreement with the release and asked his employer to remove it; Roper refused and fired Knox.

Knox sued Roper and its affiliated companies in the United States District Court for the Northern District of Georgia for one count of retaliation and one count of race discrimination in violation of Title VII.  Following discovery, the district court granted summary judgment to the defendants on both claims.

It is clear from our case law that an employer may not respond to a claim of race discrimination by conditioning continued employment on a release of claims and firing the employee for refusing.  To do so constitutes unlawful retaliation.  Here, there was enough evidence in the record, when taken in a light most favorable to Knox, to support his claim that that's precisely what Roper did -- adding the release as a condition of continued employment only after Knox made his protected complaint.  Accordingly, we are obliged to reverse the district court's grant of summary judgment to Roper on Knox's retaliation claim and remand for further proceedings consistent with this opinion.  As for the race discrimination claim, however, we agree with the trial court that Knox failed to proffer comparators that were similar in all material respects.  Thus, we affirm the grant of summary judgment to Roper on Knox's race discrimination claim.

I.

The extensive record included depositions taken from Knox, Bettina Ginn (the human resources plant director for Roper, to whom Kayla, Knox's daughter, complained), Katye Semanson (Roper's director of human resources), Joseph ("Joe") Renzetti (president of Roper), Greg Anderson (vice president of human resources for Roper Technologies, Roper's parent company), Janet Hill (Knox's former attorney), Melanie Nealis (deputy general counsel for Roper Technologies), and Michael Ingram (a designer for Roper and one of Knox's proposed comparators), as well as the personnel files of Knox's proposed comparators and other documentary evidence.

The evidence revealed these essential facts.  Roper's violence in the workplace policy stated that Roper "believes in maintaining a safe and effective workplace environment for all employees" and "[a]ny employee who exhibits violent or threatening behavior will be subject to corrective action up to and including, termination."  On September 28, 2015, Knox got into a fight with his adult daughter, Kayla Knox, at their shared home.  Knox admitted that he slapped Kayla across the face, but said that he did so only after she became violent with him.  He squarely denied Kayla's written statement, which had characterized him as the aggressor.  The same day, Kayla returned to work at Roper's facility and reported the incident to Bettina Ginn, the human resources plant manager for

Roper.  Ginn immediately reported the incident to Katye Semanson, Roper's

director of human resources, who in turn informed Joe Renzetti, Roper's president,

the same day.  Renzetti and Semanson decided to suspend Knox -- initially with

pay -- while Roper investigated the incident; Ginn informed Knox of the decision

on September 29.

The next day, Knox called Roper's Ethics and Compliance Employee

Hotline and complained that he was being treated more harshly on account of race

than two white employees (Chad Warner and Phillip Cruce) who had gotten into a

physical altercation at work, and were allowed to continue working, whereas he

was not afforded that opportunity.  Semanson testified that she was made aware of

Knox's hotline complaint within approximately 24 hours of its occurrence.

Renzetti also said that he was aware of the hotline complaint when he made all of

the employer's decisions regarding Knox.

Although Renzetti's boss and others recommended that Renzetti terminate

Knox for violating the workplace violence policy, Renzetti testified that he wanted

to give Knox a chance to continue working for Roper.  Accordingly, Renzetti

offered Knox three options, which he explained on an October 6 phone call

between Knox, Renzetti, and Semanson: accept termination; resign and sign a

release in order to receive a severance package; or complete an anger management

course while on unpaid leave and keep his job.  Renzetti told Knox that he would

have to sign a release to receive the severance package but did not mention signing

a release following anger management counseling.

On October 9, Knox called Semanson to tell her that he wanted to attend

anger management classes and keep his job.  He also said that he believed he was

being treated more harshly than his white counterparts.  Semanson told him that he

could return to work after he received a certificate of completion of the course;

again, no mention of the release was made.

Roper then sent Knox a Last Chance Agreement ("LCA") dated October 9,

2015, which included a general release and stated, in relevant part:

> You acknowledge and agree that the consideration provided under this LCA
> represents valuable consideration that the Company is not obligated to provide
> you.  You hereby fully, forever, irrevocably and unconditionally release, settle
> and discharge the Company from any and all manner of claims, charges,
> complaints, debts, liabilities, demands, actions, causes of action, suits, rights,
> covenants, contracts, controversies, agreements, promises, omissions,
> damages, obligations and expenses of any kind, whether known or unknown,
> which you have, had, or may have against the Company or any Company-
> sponsored employee benefit plans arising from, or relating in any way to, your
> employment relationship with the Company occurring through the date you
> sign this Agreement.  Specifically included in this waiver and release are,
> among other things, any and all claims arising under Title VII of the Civil
> Rights Act, the Americans With Disabilities Act, the Family and Medical
> Leave Act, the Georgia Equal Employment for Persons with Disabilities
> Code, the Georgia Equal Pay for Equal Work Act and the Common Day of
> Rest Act, as well as any other federal, state or local statutes, and any claims
> under common law including but not limited to claims in tort or for breach of
> contract.

The LCA went on to explain that:

> Nothing in this LCA prevents you from filing a charge or complaint with or
> from participating in an investigation or proceeding conducted by any federal,
> state or local agency charged with the enforcement of any employment laws,
> although by signing this LCA, you are waiving any right to individual relief
> based on claims asserted in such a charge or complaint.

In other words, the release would not bar him from filing an EEOC charge, but it would prevent him from filing suit or obtaining any individual relief arising out of the claim.

Knox received the LCA in the mail on October 12, after he had attended the first part of the required anger management course.  On October 13, he sent Semanson a letter prepared by his attorney, Janet Hill, explaining that he believed he was being retaliated against for having made a hotline complaint of racial discrimination by being asked to sign the release, which had not been previously discussed, except with respect to the severance package.

Knox and Semanson spoke by phone on October 14: Semanson told Knox the company would not remove the release and that Knox had until October 19 to sign the LCA including the release in order to keep his job.  A follow-up letter from Roper to Knox, dated October 14, said that Knox's "off duty behavior of a violent nature that resulted in the physical assault of a co-worker" was sufficient reason to fire Knox.  The letter also said that, in lieu of termination, Roper had offered him the ability to retain his position should he return to work after executing the LCA and fully satisfying its conditions.  The letter told Knox that

Roper had investigated his claim of race discrimination and found nothing to support it.

On October 16, Janet Hill, Knox's attorney at the time, spoke with Melanie Nealis, Roper's deputy general counsel, by telephone.  Hill believed that including the release in the LCA was retaliatory.  Hill testified that Nealis told her it would have been foolish to allow Knox, after his hotline complaint, to return to work without signing a release only thereafter to have to defend itself against a baseless EEOC claim.  Nealis also explained that Knox's claims were baseless because Warner and Cruce were not appropriate comparators since they were rehired out of business necessity, and they were contrite and apologetic, whereas Knox was not. Hill added that Nealis told her "pretty much verbatim" that "the release became an issue because [Knox] made a claim of discrimination" and "it would be foolish to offer him his job back and then have to defend a baseless lawsuit."

Nealis sharply disputed Hill's description of the conversation.  Nealis testified that she engaged in settlement discussions with Hill regarding the retaliatory nature of the LCA's release.  She did not recall if Hill discussed whether Knox was initially required to sign a release along with completing the anger management course.  Nealis denied ever telling Hill that it would be "crazy" for Roper to permit Knox to remain employed without having him sign a release.  She denied telling Hill that Knox was required to sign the release because he had

already raised claims of race discrimination.  Rather, their conversation concerned whether the LCA was retaliatory, and she did not believe that it was.  Nealis also reminded Hill that the release allowed Knox to pursue his EEOC charge.  She claimed she told Hill that Roper was always going to require an LCA, that there was only one LCA ever drafted, and that it was presented to Knox.  She averred that Hill had mischaracterized her statements.  She added that Warner and Cruce were inappropriate comparators because they, unlike Knox, were immediately terminated for violent behavior, and that the incident had occurred before her time, so she was unaware of whether those employees had ever been asked to sign releases.  Finally, according to Nealis, she reminded Hill that an LCA was not typical; rather, it was a special offer.

On October 19, 2015, Knox sent Semanson still another letter, also prepared by his counsel, which said that he "remain[ed] willing to do everything Roper ha[d] asked [him] to do under the last chance agreement, except [he was] unwilling to sign away [his] rights under Federal law."  Knox was fired.  His official separation notice, dated October 20, 2015, listed the reason for separation as "misconduct."  Despite being terminated, Knox completed the anger management course.

Joe Renzetti testified that he created and explained to Knox the three options, and that he always intended for the LCA to contain a release.  Although he

did not recall mentioning the release during his initial conversation with Knox, he said he preferred to handle those matters in writing and claimed he told Knox that he was mailing Knox formal documents that Knox should read through before choosing how to proceed.  Renzetti did not know when the LCA was created or who drafted it, and the first time he saw the LCA was on October 9.  Renzetti claimed that it was his decision to include the release in the LCA, and that he gave directions to Semanson and to Roper's attorneys about what to include in the LCA, but he refused to disclose privileged communications with counsel.  Renzetti believed that he had offered LCAs or similar agreements in the past to other Roper employees and to employees of his prior companies.  Roper could not identity who they were.  Renzetti said, however, it was a normal business practice to include a release in an LCA.

The parties cross-moved for summary judgment.  Knox also moved in limine to compel discovery of communications about the drafting of the LCA -- communications Roper claimed were attorney-client privileged.  All of the motions were referred to a magistrate judge, who recommended granting summary judgment to Roper on Knox's race discrimination claim because his comparators were not similarly situated.  However, he recommended denying summary judgment to the employer on the retaliation claim. The magistrate judge explained that a jury could reasonably conclude that Roper added the release only after Knox

complained of discrimination, that Knox would not have been fired had he signed the release, and that the proffered reason for the firing (violating the workplace violence policy) was a pretext for unlawful retaliation. The magistrate judge also recommended denying Knox's motion in limine, concluding that the communications regarding drafting the LCA were protected by attorney-client privilege.

Upon review, the district court denied the motion in limine and granted summary judgment to the defendants on the race discrimination claim because Knox's proposed comparators were not sufficiently similar. But, the district court rejected the Report and Recommendation and granted summary judgment to the defendants on the retaliation claim. The court reasoned that since Knox was subject to termination for violating the workplace violence policy, his complaint of race discrimination could not have been the but-for cause of his termination.

Knox timely appealed to this Court.

## II.

We review a district court's grant of summary judgment de novo. Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997); Jameson v. Arrow Co., 75 F.3d 1528, 1531 (11th Cir. 1996). Summary judgment is appropriate only where there is no genuine issue of material fact. Fed. R. Civ. P. 56(a). We also draw all reasonable inferences in the light most favorable to the

nonmoving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).  Where the record taken as a whole, and drawn in the light most favorable to the nonmoving party, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Moreover, we review evidentiary rulings, such as a ruling on a motion in limine, only for abuse of discretion.  Chrysler Int'l Corp. v. Chemaly, 280 F.3d 1358, 1362 (11th Cir. 2002).  However, "[t]o the extent that the appeals involve mixed questions of law and fact, regarding the applicability of the attorney-client privilege to particular communications that the plaintiffs wish to discover, our review is plenary."  Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1413 (11th Cir. 1994).

## A.

A plaintiff alleging retaliation in violation of Title VII "must begin by establishing a prima facie case; the plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities."  Little, 103 F.3d at 959.  "These three elements create a presumption that the adverse action was the product of an intent to retaliate."  Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009).

Once the plaintiff has established a presumption of retaliation, the burden shifts to the defendant to rebut the presumption.  Id.  That is, "the defendant employer must articulate a legitimate, [nonretaliatory] reason for the challenged employment action."  Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).  Notably, "the employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it [retaliated] against the plaintiff.'"  Id. (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

If the employer has met its burden of production and has proffered a legitimate, nonretaliatory reason for the adverse action, the burden shifts back to the plaintiff.  The presumption of retaliation is eliminated and the plaintiff then must come forward with evidence allowing a reasonable factfinder to conclude that the proffered reason was pretextual.  Chapman, 229 F.3d at 1024.  The plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Id. (quoting Combs, 106 F.3d at 1528).  In determining whether a proffered reason is unworthy of credence, a court will consider "weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action."

Combs, 106 F.3d at 1538 (quotation omitted).

It is undisputed that Knox's complaint of racial discrimination was a protected activity and that his termination was an adverse employment action.  The only question is whether Knox has offered enough evidence from which a reasonable juror could conclude that his protected activity was causally linked to his termination.  In University of Texas Southwestern Medical Center v. Nassar, the Supreme Court held that "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  570 U.S. 338, 362 (2013).  At summary judgment, then, Knox was required to come forward with enough evidence from which a reasonable juror could find that his complaint of race discrimination -- his protected activity -- was "a but-for cause" of his termination.  See id.  We think he has.

Knox has offered evidence, if credited, from which a reasonable factfinder could conclude that Roper added the release of claims to the LCA because Knox complained about race discrimination, that Knox would have signed the LCA if the LCA did not include the release, and that Knox would not have been fired had he signed the LCA.  It is uncontested that a release was mentioned in the initial conversation between Knox, Semanson, and Renzetti only as to the severance

package.  Moreover, Knox's counsel, Janet Hill, unambiguously testified that

Roper's counsel told her "pretty much verbatim" that "the release became an issue

because [Knox] made a claim of discrimination," adding that "it would be foolish

to offer him his job back and then have to defend a baseless lawsuit."  Although

Roper's counsel has disputed Hill's description of her comments, we are required

to resolve that factual dispute in favor of Knox at this stage in the proceeding.

What's more, Knox testified that he would have signed the LCA had Roper

removed the release as he requested, and, indeed, he completed the anger

management classes on his own.  Taking these facts in the light most favorable to

Knox, a reasonable juror could find that Knox would not have been fired had he

not complained of race discrimination.

Our case law confirms that a plaintiff could establish a causal connection

between the protected activity and termination when an employer responds to an

employee's discrimination complaint by conditioning the employee's continued

employment on a release of claims and then fires the employee for rejecting the

release.  We affirmed this principle in Wright v. Southland Corp., 187 F.3d 1287

(11th Cir. 1999), then in Goldsmith v. Bagby Elevator Co., 513 F.3d 1261 (11th

Cir. 2008), and again most recently in Chapter 7 Trustee v. Gate Gourmet, Inc.,

683 F.3d 1249 (11th Cir. 2012).  In Wright, the employee filed an EEOC charge

and an HR specialist of his employer asked him whether he was going to drop the

complaint, told him he would "regret it" if he didn't, then recommended his firing

a month later.  Wright, 187 F.3d at 1305.  Although the employer offered non-

retaliatory reasons for his firing, a panel of this Court concluded that under those

facts, a jury could reasonably find that he was fired in retaliation for filing an

EEOC complaint.  Id. at 1306.

In Goldsmith, the employee filed an EEOC race discrimination charge, his

employer thereafter asked him to sign an arbitration agreement that would cover all

employment-related claims -- past, pending, and future -- and fired him for

refusing to sign it after the employer refused to exclude from its application his

pending EEOC charge.  Goldsmith, 513 F.3d at 1271–72.  We affirmed a jury's

retaliation verdict in favor of the employee, observing that "immediate termination

for his refusal to sign the agreement established a causal relation between his

protected activity . . . and his termination."  Id. at 1278.  Although the Court in

Goldsmith applied a pre-Nassar standard that the protected activity and adverse

action were not "wholly unrelated," the Court also said that "Goldsmith was

terminated immediately after and because he refused to sign an agreement that

would have applied to his pending charge."  Id.

Finally, in Gate Gourmet, an employee filed an EEOC charge of pregnancy

discrimination.  Gate Gourmet, 683 F.3d at 1252.  Under company policy, the

employer would have offered her a light-duty position, but upon learning of the

charge, conditioned the offer on the employee dropping the EEOC charge.  Id. at

1253.  Again, we noted that the employer "would have [offered her a light-duty

position] but for the fact that she filed an EEOC charge."  Id. at 1260 (emphasis

added).  A panel of this Court concluded that there was a "reasonable inference"

that "the statutorily protected filing of and refusal to settle the EEOC charge

caused [her employer] to deny [her] a light-duty position," which constituted

retaliation.  Id.

In this case, the district court concluded that inasmuch as Knox was subject

to termination prior to internally raising race discrimination, and because Renzetti

testified that he always contemplated including the release in the LCA, Knox's

complaint could not have been the but-for cause of his termination.  No one has

disputed that Knox was subject to termination for violating the workplace violence

policy.  The question, however, is not whether Roper could have fired Knox based

on his violation of company policy, but rather whether Roper would have fired

Knox in the absence of Knox's protected activity.  If Roper would not have

included the release but for Knox's complaint, and if Knox wouldn't have been

fired but for his refusal to sign the release -- difficult evidentiary judgments that a

jury must make after assessing the credibility of the witnesses -- then Roper would

have unlawfully retaliated.

The record evidence raises a genuine issue of material fact whether Knox would have been fired had he not complained.  For starters, neither Renzetti nor Semanson dispute Knox's claim that a release was mentioned in the initial conversation, but only in relation to the severance package.  Moreover, Hill's testimony and contemporaneous emails to Nealis suggest that the company decided to add the release because Knox had complained.  Although there is a substantial body of evidence cutting in the other direction, we cannot resolve material issues of disputed fact on summary judgment.  Viewing the record in the light most favorable to Knox, a reasonable juror could find that had Knox not complained about race discrimination, Roper would not have added the release to the LCA, and Knox would have signed the LCA and kept his job.  Accordingly, we reverse the grant of summary judgment in favor of defendants on Knox's retaliation claim and remand the matter for further proceedings.

## B.

A Title VII claim for race discrimination similarly proceeds under the burden-shifting framework, but Knox's race discrimination claim fares less well in the inquiry.  A Title VII plaintiff claiming race discrimination may meet his prima facie burden by offering a so-called "comparator" -- a similarly situated individual outside of the protected class who was treated differently than the plaintiff.  See Lewis v. City of Union City, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc).  This

Court, sitting en banc, recently clarified that the comparator must be "similarly situated in all material respects."  Id. at 1218.

The comparators offered by Knox are not similarly situated in all material respects.  Knox points to three individuals, two of whom were involved in a violent altercation with each other.  Knox specifically claims that Michael Ingram, a white Roper employee, was not disciplined after a domestic violence incident with Ingram's wife, and that Chad Warner and Phillip Cruce, also white Roper employees, got into a violent altercation at work and were permitted to continue working with pay while they attended anger management classes.  The problem is that neither Ingram nor Warner and Cruce are similarly situated in all material respects.

Michael Ingram, a white male and designer for Roper, testified in a deposition that, in 2011, while employed by Roper, he was arrested and charged following a fight with his former wife.  He said he was intoxicated, fell while attempting to carry his wife out of the house, and then grabbed her neck as leverage to get back to his feet.  Notably, his ex-wife was not and had never been an employee of Roper or any other Roper Technologies subsidiary.  Ingram said that although he attended anger management courses in order to get the charges dropped, those courses were not required by Roper, he was not required to sign an LCA as a result of the incident, and he suffered no other work-related

consequences.  Plainly, Ingram was not similarly situated in all material respects: although he was involved in a domestic violence incident outside work, the altercation did not involve one of Roper's employees.

Nor were Warner and Cruce similarly situated in all material respects, but for different reasons.  Warner and Cruce were involved in a fight at work.  Warner slapped Cruce, Cruce threw a punch, and the fight proceeded to the floor where it was broken up.  Warner and Cruce violated Roper's workplace violence policy. Both men were immediately terminated.  Neither was offered an LCA initially. Weeks after their termination, Warner and Cruce were rehired out of business necessity and were permitted to work while attending anger management courses. The facts of their immediate termination and subsequent rehiring out of necessity undermine Knox's claim both that they had been treated less harshly -- indeed, they were both immediately fired -- and that they were similarly situated in all material respects.

Moreover, the incidents involving Ingram and Warner and Cruce all occurred under different supervisors.  The supervisors during those incidents were George Mathis and Richard Milsap, while the supervisors at the time of Knox's disciplinary action were Renzetti and Semanson.  As we have explained, "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination."  Silvera v. Orange Cty. Sch. Bd.,

244 F.3d 1253, 1261 n.5 (11th Cir. 2001).  This is because "[d]ifferent supervisors

may have different management styles that -- while not determinative -- could

account for the disparate disciplinary treatment that employees experience." Jones

v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1312 n.7 (11th Cir.), superseded

in part, 151 F.3d 1321 (11th Cir. 1998).  While not dispositive, the fact that

different supervisors were involved is still another meaningful distinction.

The district court did not err in granting summary judgment on this claim

because Knox's proffered comparators were not similarly situated in all material

respects.

## C.

Knox has raised one final issue: whether he is entitled to the discovery of

certain communications about which Roper has claimed attorney-client privilege;

and, if not, whether he is otherwise entitled to exclude Renzetti's testimony that

Renzetti was the decision maker, that Renzetti decided to include the release in the

LCA, and that Renzetti always intended to include the release in the LCA.

Knox argues that the trial court abused its discretion in denying his motion

in limine and erred in finding that Roper had not waived its attorney-client

privilege as to the drafting of the LCA.  Knox claims that the record supports the

inference that either Nealis (Roper's in-house counsel) or Bob Cameron (Roper's

outside counsel) were the true decision makers -- not Renzetti -- because Nealis

instructed Cameron to draft the LCA and because Nealis said the release "became an issue" because of Knox's complaint.  Therefore, the defendants should not have been permitted to use Renzetti's testimony offensively.  According to Knox, once Renzetti put his own motivation at issue, he waived the attorney-client privilege.  We remain unpersuaded.

It is undisputed that the attorney-client privilege protects disclosures made by a client to his attorney, in confidence, for the purpose of securing legal advice or assistance.  Cox, 17 F.3d at 1414.  The attorney-client privilege "belongs solely to the client," who may waive it either expressly or by implication.  Id. at 1417 (citation omitted).  Under the doctrine of waiver by implication, "[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."  Id. (alteration in original) (citation omitted).  "[T]he doctrine of waiver by implication reflects the position that the attorney-client privilege 'was intended as a shield, not a sword.'"  Id. (quoting GAB Bus. Servs., Inc. v. Syndicate 627, 809 F.2d 755, 762 (11th Cir. 1987)).  Thus, a party waives the attorney-client privilege when that party places privileged information in issue "through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party."  Cox, 17 F.3d at 1417 (citation omitted).

The district court did not err in finding that the defendants had not waived attorney-client privilege here.  Most importantly, the defendants did not assert an advice-of-counsel defense.  The fact that the communications might be helpful to Knox's claim does not in itself waive the privilege.  Renzetti testified that he was the decision maker and that he wanted to include the release and, generally, that he told the lawyers what to do.  Contrary to Knox's argument, this constitutes record evidence that Renzetti was the decision maker -- and it is undisputed that Renzetti crafted and presented three options to Knox -- though of course the jury would be entitled to assess Renzetti's credibility for itself.  Renzetti did not reveal the substance of his communications with his counsel.  His testimony does not constitute an offensive, selective waiver of privilege that entitles Knox to discover the privileged material.

\* \* \*

Accordingly, we affirm in part and reverse in part the judgment of the district court: we affirm the entry of summary judgment to Roper on Knox's race discrimination claim and the denial of Knox's motion in limine; we reverse on Knox's retaliation claim.[1]  Knox has presented sufficient evidence to take his retaliation claim to a jury.

---

[1] As for Plaintiff's Motion for Partial Summary Judgment regarding the defendants' affirmative defenses, which the district court denied as moot in light of its grant of summary judgment to the

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

defendants on both counts, we leave it to the district court to consider that motion on the merits in the first instance.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 30, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  18-11756-EE
Case Style:  Brad Knox v. Roper Pump Company, et al
District Court Docket No:  1:16-cv-02538-ODE

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against the appellees.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Elora Jackson, EE at (404) 335-6173.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs